**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 2 3 2004

JAMES W. McCORMACK, CLERK
By:_____
                              DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
WESTERN   DIVISION

H.P. AND R.N., by their next friend,       *
SUSAN PIERCE and DISABILITY                *
RIGHTS CENTER, INC.                        *
                                           *
                    Plaintiffs             *
                                           *
VS.                                        *          NO: 4:03CV812  SWW
                                           *
KURT KNICKREHM, in his official            *
capacity as the Director of the Arkansas   *
Department of Human Services; ET AL.       *
                                           *
                    Defendants             *

**MEMORANDUM OPINION AND ORDER**

Plaintiffs H.P. and R.N., mentally retarded adults admitted to state-operated human

development centers ("HDCs"), and the Disability Rights Center, Inc. ("DRC"), bring this

lawsuit pursuant to 42 U.S.C. § 1983 against the Director of the Arkansas Department of Human

Services ("ADHS") and officers of the ADHS Division of Disability Services ("DDS").[1]

Plaintiffs claim they have been committed to HDCs pursuant to statutory and administrative

procedures that violate due process and equal protection guarantees.

Before the Court is Plaintiffs' motion for summary judgment (docket entry #65),

Defendants' responses (docket entries #78, #89), and Intervenors' response (docket entry #89), as

_____

[1]Defendants are sued in their official capacities only and include Kurt Knickrehm, the
Director of the ADHS, James C. Green, the Director of the DDS, and members of the DDS
Board: Thomas Dolislager, Luke Heffley, Kay Barnes, Grover Milton Evans, Wesley Kluck,
Randy Lann, and Suzann McCommon.

1

well as Defendants' motions for summary judgment (docket entries #68, #80, #94), Plaintiffs'

response (docket entry #72), and Defendants' reply (docket entry #82). The Court has carefully

considered each motion and supporting brief, as well as each response and reply. For the reasons

stated below, the Court concludes that both motions for summary judgment should be granted in

part and denied in part.

## I. Background

Plaintiffs claim that Arkansas statutory and administrative "voluntary admission"

procedures that allow parents and guardians to admit their wards and children to HDCs without a

judicial hearing violate the Fourteenth Amendment's Due Process and Equal Protection Clauses.

By way of relief, they seek a declaration that the challenged procedures are unconstitutional and

injunctive relief requiring Defendants to provide H.P. procedural protections that conform to due

process requirements, including a judicial hearing to determine whether he requires institutional

care.

### Admission Procedures

The Arkansas Mental Retardation Act ("Act") provides for the creation and maintenance

of six HDCs for the care, custody, treatment, and training of mentally defective individuals. *See*

Ark. Code Ann. § 20-48-403(a).  A person may be eligible for admission to an HDC if, due to

developmental disability, he or she is incapable of managing the affairs of life and requires

special care. *See id.* § 20-48-404(1). The six-center system provides residential care and

services to individuals whose developmental disabilities are primarily caused by mental

retardation, cerebral palsy, epilepsy, or autism. *See* DDS Director's Office Policy Manual, Policy

No. 1035.

A parent or guardian of a mentally defective person may request that person be admitted to an HDC by submitting a petition to the Board of the ADHS Division of Disability Services ("Board") *See id.* § 20-48-405.  The petition must include a statement as to whether the parent or guardian desires voluntary admission or commitment. *See id.*

Upon receipt of a petition for admission, the circumstances of each applicant are reviewed by an ADHS admissions committee to ascertain whether the applicant is developmentally disabled and would  benefit from the treatment provided at an HDC.[2]   The committee consists of psychologists, social workers, residential services, medical services, and other professionals. *Compare* docket entry #67, Pls.' St. of Mat. Facts, ¶ 29 *with* docket entry #79, Defs.' St. of Mat. Facts,  ¶ 29.

The Act requires that two reputable physicians, appointed by the Board, examine individuals under consideration for admission and determine their condition and mental status. Ark. Code Ann. § 20-48-406(2)(A).  The examining physicians must use standard mental and psychological tests and physical examinations to determine whether an individual is developmentally disabled and in need of HDC services. *See id.* § 20-48-404(2).

If it is determined that statements in the petition for admission are true and the individual is incapable of managing his or her affairs and requires HDC services, the Board, or its delegate, may permit the voluntary admission of the individual for such time as the Board, or its delegate, deems necessary. "The admission shall be by action of the Board without the necessity of any

---

[2]The Act charges the Board with  investigating petitions for voluntary commitment. *See id.* § 20-48-406(a)(1).  However, the Board has delegated this responsibility, and others, to the Director of the DDS. *See* docket entry #70, Ex. 20 (hereinafter "Green Dep.") at 12.

court procedure." *Id.* § 20-48-406(b).

Alternatively, the Board may determine that an individual should be admitted by legal commitment only. *See id.* § 20-48-406(c).   In such case, the Board must file a petition for commitment with the circuit court of the county in which the individual resides.   The circuit court must then hold a hearing to determine whether the individual should be committed to a center.

A person who enters a center by voluntary admission may be withdrawn at any time pursuant to the application of the parent or guardian who has legal custody of the individual. *See id.* § 20-48-412.  An individual committed by order of a probate court may not be discharged until, in the judgement of the board and center superintendent, his or her condition justifies discharge. *Id.*

Once admitted, each HDC resident is assigned an interdisciplinary team, consisting of the resident, his or her parents and guardians if any, and members of the center's medical staff. *Compare* docket entry #70, Defs' St. of Mat. Facts, ¶ 6 *with* docket entry #74, Pls.' St. of Mat. Facts,  ¶ 6.  According to DDS policy, the purpose of the interdisciplinary team is to enhance the development of  HDC residents and "maximize their potential to the fullest possible extent, so as to facilitate their assimilation into the ordinary and normalized life of the community."  Docket entry #70, Ex. 28.

Interdisciplinary teams are charged with periodically examining whether a resident's needs can be met in a community setting or whether they continue to require HDC placement. *See* docket entry #70, Defs' St. of Mat. Facts, ¶ 7.  However, the record indicates that in the case of a voluntary admission by a parent or guardian, the ultimate decision of whether to discharge a

resident belongs to the parent or guardian.  Docket entry #65, Ex. 2 (Green Aff.) at 35-36.

Parents, guardians, and "the individual affected" may appeal any placement, transfer, or

discharge decisions to the HDC superintendent and then to the Board. Ark. Admin. Code 016-05-

002 (DDS Director's Policy Manual, No. 1076).  The decision of the DDS Director is a final

agency decision, which is subject to judicial review pursuant to the Arkansas Administrative

Procedure Act. *See* Ark. Code Ann. § 25-12-212.[3]

**Plaintiffs**

H.P. is 39 years old.  He is moderately mentally retarded and suffers from a seizure

disorder and an intermittent explosive disorder.  On April 3, 1987, H.P. was admitted to the

Booneville HDC ("BHDC") on an emergency basis pursuant to Intervenor Sue Ellen Gibson's

request.[4]  Gibson is H.P.'s mother and guardian.  Prior to H.P.'s admission to the BHDC, he had

been hospitalized for a drug overdose, which was self administered during a suicide attempt.  On

April 17, 1987, the BHDC approved H.P.'s voluntary admission.

In June 1987, Gibson removed H.P. from the BHDC, against medical advice, after he

sustained injuries during an altercation with another BHDC resident.  H.P. lived with Gibson for

several years after she withdrew him from the BHDC.

---------------------

[3]The scope of judicial review is limited.  A court may reverse or modify an agency
decision if the substantial rights of the petitioner have been prejudiced because the administrative
findings, inferences, conclusions, or decisions are: in violation of constitutional or statutory
provisions, in excess of the agency's statutory authority, made upon unlawful procedure, affected
by other error or law, not supported by substantial evidence of record, or arbitrary, capricious, or
characterized by abuse of discretion. Ark. Code Ann. § 25-15-212.

[4]By affidavit, Kay Shaw, a team leader at the Alexander HDC states that each time H.P.
has been admitted to an HDC, it was pursuant to Gibson's application.  Docket entry #70, Ex.
10.

On March 4, 1998, H.P. entered a psychiatric center for treatment of aggressive behavior. On March 25, 1998, the center discharged him to a residential care facility, where his seizures became uncontrollable. On March 26, 1998, H.P. entered Ouachita Industries, but he was discharged ten days later because of aggressive and self-abusive behavior. H.P. then entered the Alexander HDC ("AHDC") for a week-long diagnosis and evaluation, after which he was admitted to the Southeast Arkansas HDC ("SEAHDC") on a respite basis. H.P. was admitted to the SEAHDC on a regular basis, pursuant to Gibson's application, on May 28, 1998. On October 22, 2003, at Gibson's request, H.P. was admitted to the AHDC, where he currently resides. H.P. has never received a judicial hearing to determine whether he requires institutional care.

R.N. is 43 years old. He is mildly mentally retarded and suffers from mental illness. R.N. was admitted to the SEAHDC on August 3, 1999. On August 14, 2000, a state court appointed Charlie Harris as R.N.'s guardian, and specifically granted Harris the authority to "enter consent on behalf of [R.N.] to long term care placement . . . ." Docket entry #70, Ex. 23. Harris, who is not related to R.N., works for a private company that provides community-based services for developmentally disabled people. After Harris became R.N.'s guardian, he immediately began seeking community placement for R.N. *See* docket entry #70, Ex. 1 at 10-11. Eventually, the SEAHDC located alternative community placement for R.N. and discharged him on January 14, 2004.

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

6

of law." Fed. R. Civ. P. 56(c). As a prerequisite to summary judgment, a moving party must

demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for

summary judgment, the non-moving party must "do more than simply show there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986). The non-moving party may not rest on mere allegations or denials of

his pleading but must "come forward with 'specific facts showing that there is a genuine issue for

trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed

fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable

jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49

F.3d 399, 401 (8th Cir. 1995). The inferences to be drawn from the underlying facts must be

viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587

(citations omitted). Further, summary judgment is particularly appropriate where an unresolved

issue is primarily legal, rather than factual. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326

(8th Cir. 1995).

### III. Discussion

Plaintiffs claim there are no disputed issues of material fact, and they are entitled to

judgment as a matter of law. Defendants also seek summary judgment asserting that (1)

Plaintiffs lack capacity to bring this lawsuit, (2) Separate Plaintiff R.N. lacks standing, (3)

Plaintiffs are not involuntarily confined, (4) Plaintiffs have received due process, (5) Plaintiffs

failed to exhaust their administrative remedies, and (6) Plaintiffs cannot show they are similarly

situated to mentally ill people committed to state facilities. The Court will consider the parties' motions for summary judgment at the same time, using Defendants' arguments to guide the discussion.

### Capacity to Sue

Plaintiffs R.N. and H.P. bring this lawsuit by and through their next friend Susan Pierce.[5] Defendants argue that Plaintiffs lack the capacity to sue through anyone other than their guardians. They propose that because Plaintiffs' guardians have not joined in the complaint, Pierce, H.P., and R.N. should be dismissed as parties for lack of capacity to sue.

Plaintiffs counter that Defendants have waived their right to challenge their capacity to sue. Under the Federal Rules of Civil Procedure, a party must raise lack of capacity by specific negative averment, which includes "such supporting particulars as are peculiarly within the pleader's knowledge." Fed. R. Civ. P. 9(a).

Many courts have held that the failure to plead capacity waives the right to object. *Wagner Furniture Interiors, Inc. v. Kemner's Georgetown Manor, Inc.* 929 F.2d 343, 345-46 (7th Cir. 1991); *MTO Maritime Transp. Overseas v. McLendon Forwarding Co.,* 837 F.2d 215, 218 (5th Cir.1988); *Garbincius v. Boston Edison Co.,* 621 F.2d 1171, 1174 (1st Cir.1980); *Summers v. Interstate Tractor and Equipment Co.,* 466 F.2d 42, 49 (9th Cir.1972); *Marston v. American Employers Ins. Co.,* 439 F.2d 1035, 1041 (1st Cir.1971).

In this case, Defendants filed a motion to dismiss, an answer, and an amended answer–none of which make any reference to Plaintiffs' capacity to sue or their ability to bring

---

[5]Pierce is a DRC advocate/investigator, who monitors facilities providing services to people with developmental and physical disabilities. *See* docket entry #54, ¶14.

suit through Pierce. The Court concludes that Defendants' argument comes too late, and they have waived their right to challenge Plaintiffs' capacity to sue.

**Standing**

Defendants assert that because R.N. is no longer subject to the alleged unconstitutional confinement that gave rise to his claims, he lacks standing, and his requests for injunctive and declaratory relief are moot. To have standing, a party must demonstrate "a personal stake in the outcome" and show that he sustained or is "immediately in danger of sustaining some direct injury." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02 (1983) (citations omitted). The alleged injury must be "distinct and palpable" and likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475 (1982). A claim for equitable relief is moot "absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Randolph v. Rogers*, 170 F.3d 850, 856 (8th Cir. 1999) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

R.N. no longer resides in an HDC, but he asserts that the Court should entertain his claims pursuant to the "capable-of-repetition-yet-evading-review" exception to the mootness doctrine. This exception allows a federal court to hear an otherwise moot claim when the duration of the challenged action is too brief to be fully litigated before its end and there is a reasonable expectation that the same party will be subject to the same action again. *Beck v. Missouri State High School Activities Ass'n*, 18 F.3d 604, 606 (8th Cir. 1994) "The exception does not apply merely because the issues might recur in another case with the same complaining party. . . . To raise a reasonable expectation, the parties must show a demonstrated probability of

recurrence; a theoretical possibility is insufficient." *Id.*(citation omitted).

R.N. states that at any time, he could be involuntarily confined at an HDC without due process of law.  But he presents no evidence to support a reasonable expectation or demonstrated probability that he will be admitted to an HDC in the future.  In fact, the record indicates that Harris prefers that R.N. live in community-based housing.  The Court concludes that R.N.'s claims are moot and must be dismissed.

### Involuntary Confinement Versus Voluntary Admission

The Supreme Court has recognized that civil commitment for any purpose constitutes a deprivation of liberty that requires due process protection.  *Addington v. Texas,* 441 U.S. 418, 425 (1979).  Defendants do not dispute that H.P. has an important liberty interest in not being confined unnecessarily, but they argue that his  current placement is voluntary and does not amount to confinement.

Defendants maintain that H.P. is voluntarily admitted, not involuntarily confined, because Gibson is H.P.'s legal surrogate, and she requested that the State admit him to an HDC.[6] H.P., adjudged to be incapacitated, is incapable of consenting to enter the State's custody. Although Arkansas law gives Gibson the power to petition for H.P.'s "voluntary" admission, her substituted consent cannot make H.P.'s admission voluntary in the real sense of the word.  *See Doe v. Austin,* 848 F.2d 1386 (6th Cir.1988) (state commitment of mentally retarded adults upon application by a guardian is involuntary), *cert denied,* 488 U.S. 967 (1988).

---

[6]Defendants argue that the pivotal question in this case is whether Arkansas law vests court-appointed guardians authority to act on behalf of their wards.  The Court disagrees.   The question is whether Plaintiffs' deprivation of liberty was accompanied by constitutionally adequate procedure.

Defendants argue that H.P. is not confined because no bars, fences, or locked doors hold him. But the evidence shows that, despite the lack of physical exit barriers at the AHDC, H.P. is not free to leave. Plaintiffs have come forward with evidence that H.P. has expressed to AHDC staff and others that he wants to leave the AHDC. According to the deposition testimony of a former HDC superintendent and the Director of DDS, if H.P. left the AHDC of his own volition, staff members would attempt to locate him and return him to the center. Further, the evidence shows that Gibson has the final say over whether H.P. will ever leave the center. Docket entry #65, Ex. 2 at 37.

The Court finds that H.P.'s placement at the AHDC amounts to confinement that implicates significant liberty interests and invokes the procedural guarantees of the Due Process Clause.

### The Process Due

Plaintiffs contend that the procedures governing voluntary admission to HDCs violate the Due Process Clause because they do not require an adversarial pre-deprivation judicial hearing, and they give guardians and parents control over how long their wards and children remain institutionalized.

The parties agree that the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), governs the Court's inquiry as to whether the State's voluntary admission procedures comply with due process requirements. The *Mathews* test requires consideration of three factors: One, the private interest that will be affected by the official action; two, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and three, the Government's interest,

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews,* 424 U.S. at 335.

The protected private interest at stake is a ward or child's interest in not being confined unnecessarily. In addition to this significant liberty interest, the Court must also consider parents' and guardians' interest in protecting the health and welfare of their children and wards. *See Parham v. J.R.,* 442 U.S. 584, 600 (1979)(noting that minors' interest in not being committed unnecessarily is inextricably linked with parents' interest in and obligation for the welfare and health of their children). The Court acknowledges that parents and guardians sometimes act against the best interest of their children and wards. Although this unfortunate fact is reason for caution, it is not the rule.[7]

With these interests in mind, the Court must consider whether the challenged procedures adequately reduce the risk of arbitrary commitment decisions. The Supreme Court's opinion in *Parham v. J.R.,* 442 U.S. 584 (1979) is particularly instructive. In *Parham,* the plaintiffs argued that children admitted to Georgia state mental hospitals by parents and guardians were entitled to an adversarial pre-deprivation hearing. But the Court concluded that an independent medical judgement as to a minor's need for institutional care would serve the private and public interests at stake as well as, if not better than, a judicial hearing. The Court prescribed procedural protections as follows:

We conclude that the risk of error inherent in the parental decision to have a child

---

[7]Historically, the law has recognized that "natural bonds of affection lead parents to act in the best interest of their children." *See Parham v. J.R.,* 442 U.S. 584, 602 (1979)(citations omitted). Additionally, Arkansas law requires that a guardian promote and protect the well-being of his or her ward. *See* Ark. Code Ann. §§ 28-65-105, 28-65-301.

institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a "neutral fact finder" to determine whether the statutory requirements for admission are satisfied. That inquiry must carefully probe the child's background using all available sources, including, but not limited to, parents, schools, and other social agencies. Of course, the review must also include an interview with the child. It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission. Finally, it is necessary that the child's continuing need for commitment be reviewed periodically by a similarly independent procedure.

*Parham v. J. R.*, 442 U.S. 584, 606-607 (1979).

The *Parham* Court acknowledged the fallibility of medical diagnosis but did not accept that "the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist . . to an untrained judge or administrative hearing officer." *Id.* at 584. The Court contemplated that judicial hearings and other procedural barriers could discourage parents from seeking needed medical help for their children. Also, the Court recognized that an adversarial confrontation could adversely affect the relationship between parent and child.

Although *Parham* concerned civil commitment of mentally ill children by parents or guardians,[8] in a companion case decided the same day, the Court held that the procedural requirements set forth in *Parham* apply equally to the civil commitment of mentally retarded minors. *Secretary of Pub. Welfare of Pa. v. Institutionalized Juveniles*, 442 U.S. 640 (1979). Likewise, this Court concludes that the due process requirements set forth in *Parham* dictate the minimum procedural requirements for committing mentally retarded adults to state

---

[8]Although the Court's discussion in *Parham* focused on whether parents have absolute discretion to decide whether their minor children should be institutionalized, the Court recognized that the statute under review also permitted the voluntary commitment of minors by guardians. Additionally, the Court held that the same procedural protections required for voluntary commitment of minors by parents and guardians apply when the state, rather than a natural parent, makes the request for commitment.

institutions.

The challenged statutory procedures in this case require that two physicians determine that the statutory requisites for admission are met before an application for voluntary admission to an HDC may be approved.  This procedure satisfies *Parham's* pre-admission requirements.[9]  However, the Court concludes that Arkansas law falls short in that it does not require that HDC superintendents discharge residents when they no longer require HDC services.  Instead, individuals who enter a center by voluntary admission may be discharged upon the application of a parent of guardian.  *See* Ark. Code Ann. § 20-48-12(a).

As explained in *Parham*, periodic, independent review of the need for continued institutional care provides a necessary check against possible arbitrariness in the initial admission decision.  *Parham*, 442 U.S. at 607 n.15.  Additionally, post-admission review procedures are futile unless the State is charged with an affirmative duty to discharge residents who no longer need  HDC services.

Defendants assert that Plaintiffs received due process in the context of state guardianship proceedings.  In Arkansas, respondents in guardianship proceedings have the right to notice and a hearing, the right to counsel, and the right to be present and present evidence.  A physician, licensed psychologist, or licensed certified social worker must evaluate the respondent's abilities prior to the hearing, and the petitioner must prove incapacity by clear and convincing evidence.

The Court agrees that Arkansas guardianship law provides respondents a wide range of

---

[9]Plaintiffs suggest that HDC employees have a financial incentive against rejecting voluntary admission applications. *See* docket entry #66.  However, the record contains no evidence that the admitting physicians required under Ark. Code Ann. § 20-48-406(2)(A) reap financial reward when they determine an individual meets the criteria for admission.

procedural protections; however, those procedures are inadequate to protect against arbitrary commitment decisions. Gibson's positions of guardian and mother make it likely that she will make decisions in H.P.'s best interests, but neither role gives her absolute discretion to make decisions for him in all cases. Arkansas law requires that guardians receive court approval prior to making certain decisions on behalf of their wards. For example, a guardian must receive approval before providing authorization for abortion, sterilization, and psychosurgery or before terminating a ward's parental or voting rights. *See* Ark. Code Ann. § 28-65-302.

Although the commitment decision is absent from the statutory list of guardian decisions requiring prior court approval, like those listed, it affects important individual rights. Just as the *Parham* Court concluded "that a child's rights and the nature of the commitment decision are such that parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized," this Court determines that a guardian cannot have absolute discretion in deciding whether his or her adult ward will remain institutionalized.

Next, Defendants argue that Arkansas law provides all the process due because "Arkansas circuit courts are expressly empowered to review guardians' placement decisions." Docket entry #69 at 14. [10] Accepting this assertion as fact, the Court does not agree that it lessens the need for State-initiated, periodic assessment of the need for continued institutional care. First, incapacitated individuals incapable of looking out for their own interests must

---

[10]Section 28-65-303 provides that the circuit court presiding over guardianship proceedings may authorize a guardian to take appropriate action for the commitment of the ward to the state hospital or to place the ward in some other suitable institution. The provision also provides: "Upon petition of the guardian or other interested person, after a hearing of which the guardian of the person and such other persons as the court may direct shall have notice, the court, for good cause shown, may modify, amend, or revoke such an order."

depend on others to take the initiative and file petitions on their behalf. It is unreasonable to expect that the DRC can provide such services for all HDC residents.

Second, the State's interest in reserving limited public resources for the truly needy is not achieved by giving guardians unchecked control over how long their wards receive institutional care at state facilities. Just as admission to HDCs must be subject to an independent medical judgment, the continuing need for institutional services must be reviewed at regular intervals by an independent professional. Further, the Board, or its surrogate, must have the power, and the duty, to discharge any resident who has progressed to the point where institutional care is no longer needed.

Finally, given the procedures currently in place whereby interdisciplinary teams examine residents' continuing need for HDC services,  post-admission review procedures coupled with a duty to discharge residents who no longer require HDC services will not unduly burden the State.

The Court concludes that the State's initial admission procedures for the voluntary admission of adults to HDCs comport with due process requirements, but the current post-admission procedures fail to provide the process due. As for a remedy, the Court declines to grant, at this time, Plaintiffs' request for "interim admission and release procedures that comport with minimal standards of due process."  The Court is ill equipped to formulate administrative procedures for state institutions, and the principles of federalism and separation of powers prevent the Court from granting the relief requested without giving adequate consideration to the views of HDC administrators. *See Lewis v. Casey*, 518 U.S. 343, 363 (1996)(admonishing district court for mandating detailed changes in state prison system without giving adequate consideration to prison administrators); *see also  Rizzo v. Goode*, 423 U.S. 362, 378

16

(1976)("When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with 'the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs.'"). The Court will order Defendants to submit proposed post-admission review procedures tailored to meet the due process requirements set forth in *Parham.* Plaintiffs will have an opportunity to object to Defendants' proposal.   Only after the Court has fully considered the proposed procedures and objections will the Court order injunctive relief.

### Exhaustion of State Remedies

Defendants argue that Plaintiffs must exhaust their available state remedies before seeking the relief sought in this case.   Defendants are mistaken.   Plaintiffs allege that their available, post-deprivation state remedies are inadequate, and, for the reasons previously stated, the Court agrees.   Under certain circumstances litigants must pursue state remedies before bringing a procedural due process claim.   Those circumstances are not present in this case.

### Equal Protection, Similarly-Situated Requirement

Plaintiffs claim they have been denied equal protection because Arkansas law provides more comprehensive procedural protections for mentally ill people facing civil commitment to state-operated mental health facilities than for mentally retarded people facing admission to HDCs.   Defendants assert that Plaintiffs' equal protection claim must be dismissed because Plaintiffs have "failed to identify anyone with whom they are similarly situated in all relevant respects who the state has treated more favorably than they."   For the reasons that follow, the Court agrees.

The Equal Protection Clause does not forbid classifications but generally requires that

government treat similarly situated people alike. *Klinger v. Department of Corrections* 31 F.3d 727, 731 (8th Cir. 1994). Absent a threshold showing that mentally retarded individuals are similarly situated to the mentally ill, specifically for the purpose of civil commitment decisions, Plaintiffs do not have a viable equal protection claim. *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994).

Defendants point to several fundamental differences between mentally retarded and mentally ill people that indicate they are not similarly situated for the purpose of commitment decisions. Defendants' points are taken from the Supreme Court's opinion in *Heller v. Doe*, 113 S.Ct. 2637 (1993).

In *Heller,* 2637 (1993), the Court held that Kentucky statutes governing involuntary admission to state facilities did not violate the equal protection clause by prescribing a lower burden of proof to commit mentally retarded individuals than that required to commit mentally ill individuals. The Court noted several pertinent differences between mentally retarded and mentally ill individuals: (1) mental retardation, a developmental disability that becomes apparent before adulthood, is easier to diagnose than mental illness; (2) mental retardation is a permanent, relatively static, condition, but manifestations of mental illness may be sudden and past behavior may not be an adequate predictor of future action; and (3) treatment for the mentally ill is more invasive then "habilitation" for the mentally retarded. *See id.* at 2642-43.

Plaintiffs contend that they are similarly situated to mentally ill individuals because "like individuals with mental illness, they are individuals with a disability at risk of involuntary confinement." But they fail to identify a single specific characteristic shared by mentally ill and mentally retarded people that indicate the two groups have a comparable risk of unnecessary civil commitment. The Court concludes that Plaintiffs have failed to show that genuine issues for trial

exist with respect to their equal protection claim.

### IV. Conclusion

IT IS THEREFORE ORDERED that Defendants' motions for summary judgment (docket entries #68, #80, #94) and Plaintiffs' motion for summary judgment (docket entry #65) are granted in part and denied in part as follows: (1) Separate Plaintiff R.N.'s claims are dismissed as moot, and R.N. is dismissed as a party to this action; (2) Plaintiffs' equal protection claim is dismissed with prejudice; and (3) the Court determines that the challenged procedures violate the Due Process Clause to the extent that they fail to provide adequate post-admission review of the continued need for HDC placement.

IT IS FURTHER ORDERED that Defendants submit proposed post-admission review procedures tailored to comport with the constitutional requirements set forth in *Parham v. J.R.*, 442 U.S. 584 (1979). Defendants have up to and including 20 days from the entry date of this order in which file their proposal, and Plaintiffs have up to and including 20 days from the filing date of Defendants' proposal in which to file a response.

IT IS FURTHER ORDERED that Intervenors' motion to strike exhibits from Plaintiffs' motion for summary judgment (docket entry #86) is DENIED AS MOOT.[11]

IT IS SO ORDERED THIS 23rd DAY OF November, 2004.

_Susan Webber Wright_
CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[11]Intervenors move to strike certain exhibits submitted by Plaintiffs in support of their motion for summary judgment. The Court did not consider those exhibits in deciding Plaintiffs' motion. Accordingly, Intervenors' motion to strike is moot.

THIS DOCUMENT ENTERED ON DOCKET SHEET IN COMPLIANCE WITH RULE 58 AND/OR 79(a) FRCP ON 11/24/04 BY VH

F I L E   C O P Y

vjt

UNITED STATES DISTRICT COURT
Eastern District of Arkansas
U.S. Court House
600 West Capitol, Suite 402
Little Rock, Arkansas 72201-3325


November 24, 2004


* * MAILING CERTIFICATE OF CLERK * *


Re:  4:03-cv-00812.


True and correct copies of the attached were mailed by the clerk to the
following:

        Janet Cecil Baker, Esq.
        Disability Rights Center, Inc.
        Evergreen Place
        1100 North University Avenue
        Suite 201
        Little Rock, AR   72207

        Dana K. McClain, Esq.
        Disability Rights Center, Inc.
        Evergreen Place
        1100 North University Avenue
        Suite 201
        Little Rock, AR   72207

        Adam H. Butler, Esq.
        Disability Rights Center, Inc.
        Evergreen Place
        1100 North University Avenue
        Suite 201
        Little Rock, AR   72207

        Breck G. Hopkins, Esq.
        Arkansas Department of Human Services
        Office of Chief Counsel
        700 Main Street
        Post Office Box 1437
        Little Rock, AR   72203-1437

        Lori Freno, Esq.
        Arkansas Attorney General's Office
        Catlett-Prien Tower Building
        323 Center Street
        Suite 200
        Little Rock, AR   72201-2610

William F. Sherman, Esq.
Attorney at Law
Pyramid Place
221 West Second Street
Suite 504
Little Rock, AR   72201-2585

cc: press

James W. McCormack, Clerk

11/24/04                                    V. Turner

Date: _____     BY: _____